THOMAS COLLINS, Respondent, Appellant, *v.* WILLIAM W. SPENCER & SONS CORPORATION, Respondent, Impleaded with LEHIGH VALLEY RAILROAD COMPANY, Appellant.

Second Department, January 22, 1926.

Appeal — Appellate Division, Second Department — conference reports — ships and shipping — action for injuries to plaintiff suffered when steel beams fell on him — plaintiff is employee of defendant corporation and was engaged in loading lighter belonging to defendant railroad with aid of steam hoist belonging to said railroad and manned by railroad employees — negligence is charged against railroad — verdict against railroad company not contrary to evidence.

In every case argued and determined by the Appellate Division of the Second Department, a report is written and preserved in its files, though only in rare instances is the report handed down as an opinion for publication.

In an action to recover for injuries suffered by the plaintiff, who was employed by the defendant corporation, a stevedoring company, which were caused by steel beams falling on him while he was at work in loading a lighter owned by the defendant railroad company which was being loaded by a steam hoist also owned by the defendant railroad company and manned by its employees, a verdict for the plaintiff against the railroad company is not against the weight of the evidence, since it appears that the evidence supports the plaintiff's contention that while he was about to unhook the sling from beams after they had been placed on the deck of the lighter, the servants of the defendant railroad company started the hoist without warning and caused the beams to fall on the plaintiff.

MOTION by the defendant, Lehigh Valley Railroad ·Company, for reargument of an appeal from a judgment of the Supreme

Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 19th day of March, 1925, upon the verdict of a jury for $30,000; also motion in the alternative for leave to appeal to the Court of Appeals.

*Clifton P. Williamson* and *H. S. Ogden,* for the motion.

*James A. Gray* [*William S. Butler* with him on the brief], and *Clarence S. Zipp* [*E. C. Sherwood* with him on the brief], opposed.

RICH, J. The defendant, the Lehigh Valley Railroad Company, is moving for a reargument in this court, upon the ground that the court overlooked or misapprehended the points made by the appellant on the hearing of this appeal, and because this court has been misled as to the facts and issues, or in the alternative, that we certify that questions of law are involved which ought to be reviewed by the Court of Appeals. The fear is entertained by the learned counsel for the moving party that, as no opinion was written in this court, it did not properly understand the facts and the points made.

The appeal papers were not overlooked; on the contrary, they received the same careful attention that is given to all matters presented for consideration. While it is true that no opinion was written, the justice to whom the case was assigned made a written report, which was before each member of the court taking part in the decision before it came up for consideration at the consultation table, and upon consultation we were of the unanimous opinion that the judgment should be affirmed. For the information of the bar it may not be unwise to say that in every case presented to this court a report is written and preserved in its files. It is only in those rare instances where we deem the publication of an opinion to be of importance that they are permitted to go down. But we think, in this case, in view of the fact that the verdict was a large one, that counsel are entitled to know something of the attention that the appeal received even before it reached the consultation table. The report that was written follows:

"The plaintiff Collins, on January 13, 1924, was in the employ of the Spencer Corporation. The Spencer Corporation is in the stevedoring business, and at the time mentioned it was engaged in loading a cargo of steel beams aboard lighter No. 124 belonging to defendant Lehigh Valley Railroad Company. This lighter No. 124 lay alongside a steam hoist, No. 406, which was moored to the dock at the Claremont Terminal, Jersey City, New Jersey. This steam hoist was also the property of the railroad company. The starboard or right-hand side of the steam hoist lay against the dock, and the starboard or right-hand side of lighter No. 124, into

which the cargo was being loaded from the dock, lay against the port side of steam hoist No. 406. The stern of lighter 124 was about fifteen feet ahead of the stern of hoist 406. The hoist was equipped with a mast and with a boom seventy-five feet long to which was attached a fall which was operated by a stationary engine located aft in the deckhouse of the hoist. The engine on the hoist and the fall were operated by the engineer of the hoist, one Caulfield. Guys attached to the boom, and used for the purpose of swinging the boom, were operated by Johansen, the captain of the hoist. The engineer and the captain were both in the employ of the defendant railroad company.

" The method of loading the steel beams was as follows: The beams were on railroad cars on the dock. The boom of the hoist would be swung over the dock and the fall lowered. A wire cable or sling twenty feet long would then be looped around each end of a draft of three or four beams and fastened by means of an eye to a hook suspended from the fall, so that the fall pennants holding the hooks and the slings took the shape of an inverted ' Y,' with the fall forming the stem and the pennants and slings forming the arms of the ' Y ' when the draft was suspended in the air. After the slings were looped around the draft of three or four beams, the beams would be lifted by raising the fall until it cleared the height of the side of the car, and the boom would then be swung over by means of the guy ropes across the steam hoist and over lighter No. 124 until the draft reached a point above where it was to be landed, when, on the signal of the men on barge 124, the fall would be lowered until the beams came to rest on wooden skids or scantlings which had been put in position by the longshoremen on lighter 124. The workmen other than the engineer and the captain of the hoist were employes of the Spencer Corporation.

" In the process of the work, after the draft had landed on the skid or scantling, one of the eyes of each sling would then be taken off the hook, the fall raised and the boom swung back over to the railroad car. The sling would thus be pulled out from under the draft which had been landed on barge 124, and the fact that the beams rested on the wooden skids permitted the sling to slip out from under the beams without deranging them. The beams were fifteen or twenty feet in length, ten or fourteen inches in width, and weighed two thousand or twenty-two hundred pounds. The work of loading the barge had gone on for some days prior to the accident on January thirteenth. The plaintiff on the twelfth had been working on the covered pier running a hand car and trucking freight. At the request of Reed, the foreman for the Spencer Corporation, the plaintiff reported for work Sunday morning,

January thirteenth, and was engaged until noon in loading pig iron from cars on the dock. After lunch he was sent to work on barge 124 to take the place of a man who had not come back to work. The accident to the plaintiff happened when the very first draft came over from the cars on the dock. During Sunday morning sufficient steel beams had been landed on the lighter to cover clear across the deck. In addition to this first layer or tier there was, on both the port and starboard sides, three or four drafts piled up one on top of the other. A colaborer of the plaintiff, known as Mike or ' Rosy ' Pazi, was working with the plaintiff and it was the duty of each of them to place the skids, land the draft and unhook the slings. As the plaintiff and Rosy stood upon these two tiers which were distant from each other about six feet, each of them stood on one end of the draft. The stowed beams above referred to came up to about their shoulders. The draft at the time of the accident was being lowered and being placed into this well down between the two tiers. As the draft came down, plaintiff was on its stern end and Rosy on the bow end. The engineer and captain of hoist No. 406 were on the stern end, on deck, one on each side of the winch and considerably back of the plaintiff, at least twenty feet. The draft was lowered and had come to rest on the skids (fol. 129). The plaintiff had to lean out from behind the beams piled up on the starboard side of the lighter, in order to signal with his left hand to the captain and the engineer of the hoist while guiding the draft out with his right hand. The plaintiff transmitted the signal to the engineer and captain by waving his hand to lower, and as the draft landed he continued to signal for more slack.

" The plaintiff testified that when he came on the lighter after lunch he found a skid or scantling in place at his end ready to receive the next draft. Rosy testified that the plaintiff himself picked out the scantling from the pile and put it in place. This difference in testimony is, however, unimportant, as the plaintiff admits that he picked up the scantling, examined it, and concluding that it was adequate for the purpose, replaced it. The draft of three beams in question was hoisted out of a gondola car, cleared the car and was swung across hoist No. 406 until it came over barge No. 124. It came down slowly, the plaintiff motioning by hand with a downward motion (fols. 128, 129, 135) to the engineer, indicating that the draft was to be lowered; and after it rested on the skids the plaintiff gave the engineer a signal for slack. The plaintiff could not reach the hook on each end and had to step in toward the center of the beams to reach it (fol. 136). As he stepped in, he says: ' I put my left foot on the skid that they were placed on.' He then says: ' I reached up, and in the beginning when I

reached up I could see the boom and just as I had the eye of the cable sling to the point of the hook, like this, I could see the thing tighten. In the meantime I could see the boom shaking and swinging, like that, and no more I know' (fol. 138). The hook was about seven or eight inches long. The draft on which the plaintiff stood fell against him and crashed against the tier of beams on the other side. The plaintiff testified that he had given the engineer no signal whatever to start the machinery and that there was no one else there to give signals (fol. 158), although at another part of the record Rosy said that he also gave signals at times. At folio 159 the plaintiff, in again describing the accident, gave the following testimony: ' Q. As you took this eye off the hook, was it slack or was it taut? A. I had to reach up, it was kind of taut, I had to reach up and I held the hook of the chain with the left hand, and I was coming up with this, and I could feel the thing tightening, and I was looking up like that, and the boom moved and I was caught like that, and no more. Q. In other words the hook which was attached to the fall has a kind of lip on the end of it? A. Yes, sir.'

" Again, at folio 186, appears the following: ' Q. While these things were in the sling you couldn't reach the hook until after the draft had been let down on the scantlings, and then the fall had been dropped down several feet, could you, you couldn't reach the hook? A. The hook was to its full height when I reached up to take the eye out, there was but very little slack, and just as I got the eye of the sling to the top of the hook I could feel it tightening, I lifted it up, and in the meantime I seen the boom swing. Mr. Butler: May we have on the record that he indicated with his hands above his head. Q. You were giving signals to the engineer to slack down, weren't you? A. Yes, sir. Q. Why didn't you give a signal to bring it down if you could not reach it? A. I had it reached already and taking it out at the end of the hook when she tightened up. Q. You just told us that you could hardly reach up, it was hardly slack yet, and you had to pull up the hook to get it off. Why didn't you signal the engineer to drop it down? A. In the first place I couldn't see him from the position I was in, and I had the eye off the hook just to the point of it when it pulled out of my reach and I was caught.'

" He testified that after the engineer had lowered the fall far enough, the hooks would fall right down on the draft (fol. 190). When the draft came to rest on the skid the witness said, ' I still kept signalling when they were placed, I still kept signalling * * * for slack' (fol. 191). The witness said, at folio 194, that while a draft was still hanging taut in the sling it was five feet from

the bottom of the draft up to the big hook, from the lower part of the beam to the eye of the cable on the sling. At folio 199 is this: ' Q. I am simply asking you whether you saw whether or not the man at the other end had unhooked his sling, yes or no? If you didn't see it, say so? A. He dropped the sling just as — I see his sling drop just as the falls was taken up on my side. Q. You saw what? A. He dropped his side of the sling. Q. He did unhook his side? A. Yes, sir, when the falls got taut on me.'

" At folio 246 is this testimony: ' Q. Did I understand you correctly to say that the draft, before your accident, had actually landed on and was resting on the pieces of scantling or skids, it actually got to a point where it was resting on the skids? A. Yes, sir. Q. Is that so? A. Yes, sir. Q. Did I also understand you to say that at that time this scantling or piece of wood which you described as a skid, had not broken, is that true? A. Before I unhooked? Q. When it rested upon that skid, as you have told us, and as you were attempting to remove one of the loops from the hook, did I understand you to say, on your direct examination, that the scantling at that time had not broken? A. No, sir, it was not broken then. Q. And it wasn't until you saw that there was an upstrain on the boom that the scantling broke, is that right? A. I don't know when the scantling broke because I was caught too quick. I don't know what happened after that.'

" He said he did not hear it break; he heard no noise at all; he doesn't know whether it was broken or not. At folio 249 appears the following: ' Q. The second that it touched the skids, it is not a fact that the loops came right down together with the hook on top of the load? A. No, sir, they didn't come down, I had to step on the skid with my left foot and reach up, and just taking the eye of the cable sling off the hook when I felt the thing go up, and the boom move, and that is all I remember, it came over at me and caught me.'

" At folio 262 it appears that the plaintiff was caught between the load or draft and the tier of beams that were inshore or towards the dock. At folio 270 appears the following: ' Q. This draft when it was landed was how high above that part of the tier on which you were standing? After it had landed how high was it above that tier which you say extended all the way across, how high was that draft after it was landed on the skids? A. The skid was placed on top of the tier that was on the deck of the boat. Q. How high above that was the top of the load after it had landed on those skids? A. Probably about three feet. Q. And where did any part of this draft hit you as you claim when you met with your accident, on what part of your body did it strike? A. The hip, from the

hip down. * * * Q. Were you at that time standing alongside of the load and still with your feet on the skid? A. My left foot was always on the skid, and the other one was down in by the beams. * * * The draft caught me on the left and threw my right shoulder against the beam.'

"This is practically the nub of the plaintiff's testimony and is the most favorable for the plaintiff as to the way in which the accident happened. This testimony is all the testimony in the record which tends to sustain the plaintiff's claim that the operator of the boom negligently operated it. This issue seems to be the sole issue left to the jury on the question of defendant's negligence.

"Defendant's witness Caulfield, the engineer, said that after the accident the captain went over and picked up the loop and put it on the hook. He saw him raise the loop a little higher than his waistline and saw him place it on the hook.

"'Q. You saw one end of the sling in the hook? A. Yes, sir. [This, I suppose, referred to the other end of the sling.]. Q. It was lying down, wasn't it, under the draft? A. Yes. Q. How much of this sling did the captain pull up, two or three feet? A. The amount of the sling I cannot say. * * * Q. Did he pick up about two or three feet on the side that Collins was on? A. He picked nothing up on the side that Collins was on. Q. It was on the other side? A. Yes. Q. That he picked up the loop? A. The sling that had been released from the hook, yes, sir' (602, 603). Only one end had come off on the offshore side of the draft.

"Judge HAGARTY in charging the jury, referring to the plaintiff, said: 'He claims that the defendant Railroad Company was negligent through their engineer, the operator of this boom, * * * moving that apparatus and that caused the injuries.' At folio 833, the court charged: 'With reference to the defendant Lehigh Valley Railroad Company, the only negligence with which they may be chargeable in this case is the operation of this boom and the fall. Determine whether or not this machinery moved at the time that the plaintiff said it did. Determine that question because if it did, if the engine was started, if the boom was permitted to move, to lift up at the time that it did, as the plaintiff claims, then, gentlemen, you may find that the defendant Lehigh Valley Railroad Company was guilty of negligence, and did not exercise the duty which the law placed upon it in so far as he was concerned, and that was to use reasonable care for his safety, that is the care of the ordinarily careful and prudent man.'

"At folio 852 the court charged that if the breaking of the skid caused the accident the railroad company was not liable; and at the request of counsel for the railroad company, the court charged

that if, prior to the accident, sufficient slack had not been given upon the fall in response to plaintiff's signals, then it was the duty of the plaintiff to give a further signal before attempting to unhook the sling, and that his failing to do so would be contributory negligence and would bar a recovery against the railroad company.

" The railroad company's first point is that there was no competent proof of any causal negligence on its part. It argues that the judgment rests solely on the inference from the testimony that the captain or engineer negligently moved the boom or fall, and it is claimed that the testimony above quoted is not sufficient to sustain that inference. It urges the well-established principle of law as laid down in *Lopez* v. *Campbell* (163 N. Y. 340) as follows: ' While a material fact may be established by circumstantial evidence, still, to do so the circumstances must be such as to fairly and reasonably lead to the conclusion sought to be established, and to fairly and reasonably exclude any other hypothesis. Where the evidence is. capable of an interpretation which makes it equally consistent with the absence as with the presence of a wrongful act, that meaning must be ascribed to it which accords with its absence. In other words, it can only be established by proof of such circumstances as are irreconcilable with any other theory than that the act was done. As has been said: " Insufficient evidence is, in the eye of the law, no evidence." ' It also argues that the testimony is capable of an inference which excludes a wrongful act. It is argued that the two boats, that is, the barge and the hoist, lay side by side in navigable waters in the Hudson river, and that ' almost any movement of the waters would cause the boom on one boat to change its position with relation to another boat, in other words to shake, move or swing with reference to a man on the other boat; which of course would cause the fall to tighten and pull out of his reach under the circumstances testified to ' by the plaintiff. Consequently, it is argued that the scantling concededly broke at some time, and that if it broke at the time the plaintiff was in the act of unhooking the sling the sudden falling of the tier of beams would tighten the fall, ' thus straightening out the angle caused by the plaintiff's taking hold of it from the side; and the changing position of the beams and the consequent sudden tightening of the fall would almost necessarily produce the shaking, swing or movement of the boom which the plaintiff testified he observed at the moment of the accident.' Lastly, it is urged that the listing of the hoister, caused by the weight of the beams and the settling back of the hoister when the beams were deposited on the lighter, would produce a movement or shaking of the boom with reference to any object which was not a part of the hoister.

"The reference to folios 534 to 536, made by the appellant, does not seem to me to sustain this last position. At folio 535 appears the following: 'Q. And with a weight of three or four tons on it, it would have a tendency to list your hoist some? A. Not that weight wouldn't have such tendency. Q. It would have some tendency? A. Very little. Q. You were light, weren't you, there was no cargo on your boat? A. No, sir. Q. And this heavy boom leaning over to the center of the other barge it would tend some, you say, to list? A. Yes. Q. That is right, isn't it? A. Yes.'

"The case of *Ruppert* v. *Brooklyn Heights R. R. Co.* (154 N. Y. 90) is largely relied upon by the appellant to sustain the appeal. In that case the plaintiff's intestate was driving a wagon with a team through Grand street, occupied by tracks of the defendant railroad. He was seated on an elevated spring seat in the front part of the wagon, and when turning off the railroad track one of the front wheels of the wagon came in contact with a paving stone in the street, near the track, producing a jolt of the wagon which threw him to the ground, and one of the wheels passed over his body, resulting in his death. The presence of the stone in the street was presumed to have been the cause of the accident, and the judgment was predicated upon evidence that the defendant negligently left or placed the stone in the street. The stone was described by the plaintiff's witnesses as a granite paving block of light color, about one foot long, five or six inches wide, and about the same thickness. There was evidence that the railroad company was engaged in repaving the street between the rails at about the time of the accident, and that the stone for that purpose was carted over Grand street, at the point where the accident happened, in the defendant's carts, driven by the defendant's servants. Judge O'BRIEN, writing for the Court of Appeals, said: 'But it is equally clear from the evidence that the defendant used no granite blocks for that purpose, but only cobblestones and Belgian paving blocks of a dark blue color. * * *

"'It is also quite clear upon all the proofs that for some months before the accident the city or private individuals, or contractors for the city, had been engaged in paving streets in the vicinity of the place where the accident occurred, with granite paving blocks similar to the one which came in contact with the wagon wheel, and that such blocks had been conveyed over this street in carts. There was no direct evidence in the case as to where this particular paving block came from, or as to how it came to be in the street, or the parties who left it there. * * *

"'The jury was permitted to find that the defendant was respon-

sible for the obstruction solely upon circumstantial evidence. * * * It was absolutely necessary in this case to prove two facts before the defendant could be adjudged liable for the result of the accident. These facts were: (1) That the defendant or its servants produced the obstruction by allowing the stone to fall from the carts or by placing it there or leaving it there; (2) the mere fact that it dropped from some of the carts in use by the defendant for drawing the paving stones would not, standing alone, make out the case. The plaintiff was also bound to show that this resulted from careless or improper loading, or some other careless or negligent act of the defendant's servants, * * *. It is entirely true that a material fact in a civil or criminal action may be established by circumstantial evidence, but the circumstances must be such as to lead fairly and reasonably to the conclusion sought to be established and to exclude any other hypothesis fairly and reasonably. It has been said that circumstantial evidence consists in reasoning from facts which are known or proved, in order to establish such as are conjectured to exist, but the process is fatally vicious if the circumstance from which we seek to deduct the conclusion depends itself upon conjecture.

" ' In order to prove a fact by circumstantial evidence there should be positive proof of the facts from which the conclusion or inference is to be drawn. The circumstances themselves must be shown and not left to rest in conjecture, and when shown it must appear that the inference sought is the only one which can fairly and reasonably be drawn from these facts. * * *

" ' The only circumstance which the plaintiff proved in this case was that the defendant about the time of this accident was engaged in drawing paving stones over this street, and the inference which is sought to be drawn from that circumstance is that this granite paving block dropped into the highway from one of the carts through the negligence of the defendant's servants. But it appears that while the defendant was so engaged in moving the paving stone it was not using or moving any stone of this character and that other parties were. Hence the reasoning process is defective since it is at least as reasonable to suppose that the stone in question was left in the street by the careless act of the parties who were using and moving this kind of stone as by the defendant who was not. This hypothesis was of course much more reasonable; and so the question arises whether a verdict based entirely upon such circumstantial evidence should be permitted to stand.

" ' It is a settled principle in the law of negligence which, it has been said, should never be lost sight of, that when the plaintiff's evidence is equally consistent with the absence as with the existence

of negligence, the case should not be submitted to the jury since, in such a case, the evidence fails to establish the essential fact. * * * The case is one, we think, where it appears that the primary cause of the injury proceeded from one of two sources, or was produced by one of two agencies for one of which the defendant might be responsible, but not for the other. The plaintiff must fail if the evidence does not show that the injury was the result of some cause for which the defendant is responsible. If, upon the testimony, it is just as probable that the injury resulted from the act of the other parties engaged in paving as from that of the defendant, the plaintiff cannot recover.'

" For these reasons the judgment in favor of the plaintiff Ruppert was reversed.

" In the case at bar we have direct evidence that the boom moved and that it fell down. It is conceded that the entire hoisting apparatus was in the control of the railroad company. Under these circumstances it seems to me that it was fairly within the province of the jury to find, from the fact that the boom moved and that its control was in the railroad company, that its moving was caused by one of the railroad company's servants. It can hardly be said that this result is conjecture merely. For these reasons I think the plaintiff made out his case, although it is quite slender.

" The last point of the appellant is that the verdict is contrary to the overwhelming weight of the evidence.

" The captain and the engineer of the railroad company both testified that the machinery did not move after the draft had come to a stop and had rested on the skids. They further testified that after the accident happened and the slings had been replaced, the draft was raised by the hoisting apparatus and that this was the only time it was used after the draft had come to a position of rest on the skid. Furthermore, the plaintiff's coworker testified that the skid broke. It is argued by the plaintiff that that was the cause of the accident, and that the court correctly charged, with the acquiescence of plaintiff's counsel, that if this caused the accident the railroad company would not be liable. Here again, it seems to me, was a jury question. I rather favor the idea that the breaking of the skid caused the accident, but the jury saw and heard the witnesses and I am not disposed to recommend a reversal on the ground that their verdict is against the weight of evidence.

" So far as the Spencer Corporation is concerned, on the plaintiff's appeal the plaintiff does not point out any error. His fifth point does not impress me as having any weight. Mr. Butler says in his brief: ' Should this court determine that, for any misunderstanding of the issues submitted, upon the part of the jury, their

finding so far as the railroad company is concerned is wrong necessitating a reversal of the judgment as to it, the same reason would apply to the co-defendant and require a reversal as to it as well. If reversed for any other reason, in the interest of justice the plaintiff should be placed in the position he was before the verdict was rendered.'

" I cannot see any error at all in the jury's finding that the plaintiff's master was not negligent; and on the plaintiff's appeal I also recommend that the verdict in favor of the Spencer Corporation be affirmed.

" The case is a very close one and it has caused me considerable trouble. I invite a careful consideration of the case by my associates. The verdict is a large one but the injuries are very serious, and no argument is made that the award of damages is excessive.

" For the reasons above stated I recommend: Judgment affirmed, with costs; no opinion."

This court is now, and when its unanimous decision was rendered was, of the opinion that the accident was not caused by the breaking of the skid. We are of the opinion that the plaintiff established his cause of action by a fair preponderance of the evidence, and that these motions should be denied.

KELLY, P. J., MANNING, KAPPER and LAZANSKY, JJ., concur.

Motion for reargument or for leave to appeal to the Court of Appeals denied.